# EXHIBIT A

(Affidavit in Support of Search Warrant for Apt 243)

FILED
APR 11 2011
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
DEPUTY CLERK

# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

**2505 5th STREET, APARTMENT 243**
**DAVIS, CALIFORNIA 95616**

**APPLICATION ~~AND AFFIDAVIT~~**
**FOR SEARCH WARRANT**

Case Number:
2 11 - SW - 150 GGH

I, NICHOLAS G. PHIRIPPIDIS, being duly sworn depose and say:

I am an FEDERAL BUREAU OF INVESTIGATION SPECIAL AGENT and have reason to believe that ☐ on the person of or ☒ on the property or premises know as (name, description and/or location)

**SEE ATTACHMENT A, ATTACHED HERETO AND INCORPORATED BY REFERENCE,**

in the EASTERN District of CALIFORNIA
there is now concealed a certain person or property, namely (describe the person or property to be seized)

**SEE ATTACHMENT B, ATTACHED HERETO AND INCORPORATED BY REFERENCE,**

which is (state one or more bases for search set forth under Rule 41(c) of the Federal Rules of Criminal Procedure)

**PROPERTY THAT CONSTITUTES EVIDENCE, FRUITS AND INSTRUMENTALITY OF A CRIMINAL OFFENSE**

concerning violations of Title 18 United States Code, Sections 2252 and 2252A - Illegal Production, Distribution, Receipt and Possession of Visual Depictions of Minors Engaged in Sexually Explicit Conduct and Child Pornography. The facts to support a finding of probable cause are as follows:

**See Attached Affidavit of Federal Bureau of Investigation Special Agent Nicholas G. Phirippidis attached hereto and incorporated by reference.**

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

Signature of Affiant
NICHOLAS PHIRIPPIDIS
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me and subscribed in my presence,

APRIL 11, 2011 at SACRAMENTO, CALIFORNIA
Date City State

GREGORY G. HOLLOWS
Name of Judge Title of Judge

GREGORY G. HOLLOWS
Signature of Judge

**AFFIDAVIT OF SPECIAL AGENT NICHOLAS G. PHIRIPPIDIS IN SUPPORT OF SEARCH WARRANT**

I, Nicholas G. Phirippidis, being duly sworn, depose and state:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), presently assigned to the Sacramento Division Cyber Squad. I have been employed by the FBI since November 2007.

2. My formal education includes a Bachelor of Science degree in Computer Science, through the University of California, San Diego. My coursework involved the study of programming languages, computer systems, and Internet security. Prior to my employment with the FBI, I was a software application engineer for a Department of Defense contractor.

3. At the outset of my employment with the FBI, I attended 22 weeks of training at the FBI Academy in Quantico, Virginia. Part of that training included courses addressing basic criminal law, federal court procedures, and various investigative techniques. Particularly, I received instruction regarding computer forensic examinations and techniques pertaining to cyber investigations. I have also completed a 40 hour Internet Investigations – Online Certification Course that focused on conducting Innocent Images investigations online.

4. I have also taught and assisted with several Internet security classes for the general public and other law enforcement agencies. Specifically, I have presented on such topics as Internet social networking sites, like "MySpace" and "Facebook", and safe Internet practices for parents and students.

5. My daily duties as an FBI agent include the investigation of criminal violations relating to child exploitation, including violations pertaining to the illegal production, distribution, receipt and possession of visual depictions of minors engaged in sexually explicit conduct and child pornography (as those terms are defined in 18 U.S.C. § 2256 and hereinafter referred to collectively as "child pornography") in violation of 18 U.S.C. §§ 2251, 2252(a) and 2252A. I have received training in the area of identifying and investigating child pornography and child exploitation crimes, and as part of my duties have observed and reviewed numerous examples of child pornography in all forms of media, including computer media. In the course of my duties, I have assisted in the execution of numerous search warrants, including several relating to child exploitation investigations.

## INTRODUCTION

6. The FBI is currently investigating the possession, receipt, and distribution of child pornography through the use of a sophisticated peer to peer file sharing program/network. As discussed more fully within, investigation thus far has demonstrated that there is probable cause to believe that a computer user at **2505 5th Street, Apartment 243, Davis, California, 95616** (the "SUBJECT PREMISES") possessed, received, and distributed child pornography through a computer network for files to be shared. For that reason, this affidavit is made in support of an application for a warrant to search the SUBJECT PREMISES. I believe that located within the SUBJECT PREMISES are evidence, fruits, and instrumentalities of criminal violations relating to the knowing possession, receipt, and distribution of child pornography.

7. The SUBJECT PREMISES to be searched is more particularly described in "Attachment A" of this affidavit, affixed hereto and fully incorporated herein. I request authority to search the entire SUBJECT PREMISES, including the residential dwelling and any computer and computer media located therein, where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of the crimes enumerated in the affidavit. The search is to include all rooms, attics, basements, and all other parts therein, and surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, associated with the SUBJECT PREMISES. In addition, because I know that it is common practice for persons involved in the trafficking of child pornography to hide and transport child pornographic materials and/or their instrumentalities in vehicles, I request that the search warrant authorize the search of vehicles located at or near the residence that fall under the dominion and control of the person or persons associated with said residence. The search of these vehicles is to include all internal and external compartments and all containers, of the size that could store child pornographic materials, media, or their instrumentalities, located within the aforementioned vehicles.

8. The statements in this affidavit are based in part on information provided by other law enforcement agents, as well as my own investigation of this matter. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the violation of 18 U.S.C. §§ 2252(a) and 2252A are presently located at the SUBJECT PREMISES.

9. To my knowledge, there have been no applications to obtain information pursuant to 18 U.S.C. § 2703 and no attempts through earlier search warrants to obtain the evidence, fruits, and instrumentalities sought in this warrant from the SUBJECT PREMISES.

**RELEVANT STATUTES**

10. This investigation concerns alleged violations of 18 U.S.C. §§ 2252 and 2252A, relating to possession, receipt, distribution, and transportation of material involving the sexual exploitation of minors. The statutes, in pertinent part, are set forth below:

18 U.S.C. § 2252

(a) Any person who

(1) knowingly transports or ships using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mails, any visual depiction, if

(A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

(B) such visual depiction is of such conduct;

(2) knowingly receives, or distributes, any visual depiction using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproduces any visual depiction for distribution using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or through the mails, if

(A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

(B) such visual depiction is of such conduct;

(3) ...

(4) either

(A) ...; or

(B) knowingly possesses, or knowingly accesses with intent to view, 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if

(i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

(ii) such visual depiction is of such conduct;

shall be punished as provided in subsection (b) of this section.

<u>18 U.S.C. § 2252A</u>

(a) Any person who

(1) knowingly mails, or transports or ships using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, any child pornography;

(2) knowingly receives or distributes

(A) any child pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer; or

(B) any material that contains child pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer;

(3) knowingly

(A) ...; or

(B) advertises, promotes, presents, distributes, or solicits through the mails, or using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, any material or purported material in a manner that reflects the belief, or that is intended to cause another to believe, that the material or purported material is, or contains

(i) an obscene visual depiction of a minor engaging in sexually explicit conduct; or

(ii) a visual depiction of an actual minor engaging in sexually explicit conduct;

(4)...;

(5) either

(A) ...; or

(B) knowingly possesses, or knowingly accesses with intent to view, any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer;

... shall be punished as provided in subsection (b).

Pursuant to 18 U.S.C. §§ 2253, 2254, "any visual depiction described in [Title 18, United States Code,] sections 2251, 2251A, or 2252 2252A, 2252B, or 2260 of this chapter, or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction, which was produced, transported, mailed, shipped or received in violation of this chapter" is subject to criminal or civil forfeiture. In addition, pursuant to 18 U.S.C. §§ 2253, 2254, "any property, real or personal, used or intended to be used to commit or to promote the commission of such offense or any property traceable to such property" is subject to criminal or civil forfeiture.

**DEFINITIONS**

11. The following non exhaustive list of definitions applies to this Affidavit and Attachments A, B and C to this Affidavit:

a. "Child Pornography" includes the definition in 18 U.S.C. § 2256(8), any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual

depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

b. "Child Erotica" means materials or items that are sexually arousing to certain individuals but that are not in and of themselves obscene or do not necessarily depict minors in sexually explicit conduct or poses. Such material may include non sexually explicit photographs (such as minors depicted in undergarments in department store catalogs or advertising circulars), sexually provocative drawings, or sketches, written descriptions/stories, or journals.

c. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

d. "Minor" means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

e. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital genital, oral genital, or oral anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. See 18 U.S.C. § 2256(2).

f. "Computer" is defined pursuant to 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device

performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

g. "Computer hardware" consists of all equipment that can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes, but is not limited to, any data processing devices (such as central processing units, self contained laptop and notebook computers, hand held electronic organizers, personal digital assistants, and WebTV/DVR units), removable media, internal and external storage devices (magnetic storage devices such as hard disk drives, diskette drives, and tape drives; optical storage devices such as CD ROM drives, CD R/CD RW recorders, and DVD drives/recorders; and other memory storage devices), and related communication devices such as modems, cables, connectors, programmable telephone dialing or signaling devices, and electronic tone generating devices, and any devices, mechanisms, or parts that can be used to restrict access to computer hardware such as physical keys and locations.

h. A "system peripheral" is a piece of equipment that sends data to, or receives data from, a computer. Keyboards, mouses, cameras, webcams, video cameras, printers, scanners, plotters, video display monitors, and certain types of facsimile machines are examples of peripherals.

i. "Computer software" is digital information that can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

j. Storage media includes any material capable of storing information in a manner that can be used by computer hardware to save and/or retrieve information. Examples of storage media include diskettes, CD ROMs, DVDs, DVRs, magnetic tapes, ZIP disks, JAZ disks, thumb drives, and EPROMS.

k. "Computer related documentation" consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

l. "Computer passwords" and "data security devices" consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

m. The "Internet" is defined as a non commercial, worldwide network of computers. It is a self governing network devoted mostly to communication and research and has millions of users worldwide. The Internet is not an online service but a collection of tens of thousands of computer networks, online services, and single user components.

n. The Uniform Resource Locator (URL) is the address of a resource or file located on the Internet, also called a "domain name".

o. "Internet Service Providers" or "ISPs" are commercial organizations, which provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e mail, remote storage, and co location of computers and other communications equipment. ISPs can offer various means by which to access the Internet including telephone based dial up, broadband based access via a digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth that the connection supports. Many ISPs assign each subscriber an account name such as a user name or screen name, an e mail address, and an e mail mailbox and the subscriber typically creates a password for the account. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and password.

p. "ISP Records" are records maintained by ISPs pertaining to their subscribers (regardless of whether those subscribers are individuals or entities). These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format and in written or printed record format. ISPs reserve and/or maintain computer disk storage space on their computer system for their subscribers' use. This service by ISPs allows for both

temporary and long term storage of electronic communications and many other types of electronic data and files.

q. "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

r. The terms "records", "documents", and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD ROMs, DVRs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

s. "Digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such

as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes, and memory chips; and security devices..

t. "Image" or "copy" refers to an accurate reproduction of information contained on an original physical item, independent of the electronic storage device. "Imaging" or "copying" maintains contents, but attributes may change during the reproduction.

u. "Hash value" refers to a mathematical algorithm generated against data to produce a numeric value that is representative of that data. A hash value may be run on media to find the precise data from which the value was generated. Hash values cannot be used to find other data.

v. "Steganography" refers to the art and science of communicating in a way that hides the existence of the communication. It is used to hide a file inside another. For example, a child pornography image can be hidden inside another graphic image file, audio file, or other file format.

w. "Compressed file" refers to a file that has been reduced in size through a compression algorithm to save disk space. The act of compressing a file will make it unreadable to most programs until the file is uncompressed.

x. "Metadata" is data contained in a file that is not usually associated with the content of a file but is often associated with the properties of the application or device that created that file. For example, a digital camera photograph often has hidden data that

contains information identifying the camera that manufactured it and the date the image was taken.

y. A "JPEG" is a graphic image file. Other known graphic image files include "GIF", "TIFF", "RAW", and "BMP".

z. An "MPEG" is a video image file. MPEG files are generally larger than JPEG files and require the user to have a computer with sufficient processor speed, internal memory, and empty hard disk space. MPEG viewer software is also needed to play the files.

aa. "Malicious Software" ("malware") is software designed to infiltrate a computer without the owner's informed consent. The expression is a general term used by computer professionals to mean a variety of forms of hostile, intrusive, or annoying software or program code. The term "computer virus" is sometimes used as a catch all phrase to include all types of malware, including true viruses. Software is considered malware based on the perceived intent of the creator rather than any particular features. Malware includes computer viruses, worms, trojan horses, most rootkits, spyware, dishonest adware, crimeware, and other malicious and unwanted software.

ab. "Media Access Control address" ("MAC address") is a unique identifier assigned to a network device for communication on a physical network. MAC addresses are most often assigned by the manufacturer of a network device.

**CHARACTERISTICS COMMON TO PERSONSWHO DOWNLOAD AND POSSESS CHILD PORNOGRAPHY**

12. Based upon my training and experience and the training and experience of other agents with whom I work and with whom I have spoken, I know that the following

characteristics are oftentimes found in varying combinations in people who possess, receive, distribute, or transport child pornography:

a. These people view children as sexual objects.

b. These people collect sexually explicit and other erotic images of minors that they use for their own sexual gratification and fantasy.

c. These people rarely, if ever, dispose of sexually explicit images of minors because the images are treated as prized possessions. They store such images in different formats including photos, printouts, magazines, videotapes, and forms of digital media such as hard drives, diskettes, and CD ROMs. They store such images in different places including their home, their car, and other areas under their control. For example, laptops, electronic storage media, and child pornography are often secreted in compartments or trunks of vehicles so that those persons may hide, transport, or take the material to Internet or wi-fi locations so that they can access, trade, or add to their child pornography collections.

d. These people may use sexually explicit images of minors as a means of reliving fantasies or actual sexual encounters. They also use the images as keepsakes and as a means of gaining acceptance, status, trust, and psychological support by exchanging, trading, or selling the images to other people with similar interests.

e. These people go to great lengths to conceal and protect from discovery their collection of sexually explicit images of minors. They may use encryption software to protect their child pornographic files. They may have passwords to access programs or to control encryption that are written down and located in the vicinity of their computer, or located on their person. They may place child pornographic files in directories or

folders on their computer or other digital storage media not typically reserved for image or video files. They may change file names of sexually explicit images in an attempt to hide such images from a forensic review. They may change the extension on such image files in an effort to disguise them as a word processing file. They may also transfer such files downloaded from the Internet to removal storage media including but not limited to computer disks, thumb drives, digital cameras, smart cards, and cellular phones, and then attempt to erase the files from computer hard drives, in an effort to hide evidence of their download activity.

f. If child pornography collectors have had sexual contact with a minor, they frequently have visual depictions of the minor(s) with whom they have had sexual contact. If a picture of a minor is taken by such a person depicting the minor in the nude, there is a high probability the minor was used to produce sexually explicit images to be traded with people with similar interests. If pornographic depictions of a minor were produced as mentioned above, an analysis of the cameras, scanners, or webcams in the possession of the subject may yield clues as to what device was used in the commission of such crime. Such analysis would require the removal of the device to a laboratory setting.

g. If child pornography is found on the hard drive of a child pornography collector's computer, and his computer was connected to the Internet, there is a strong likelihood that the person received the images of child pornography from the Internet, either from Internet websites or groups devoted to child pornography, or from other individuals who sent the images via e-mail or file sharing program.

h. Child pornography collectors who acquire sexually explicit images of minors from the Internet, will frequently bookmark the locations (i.e. websites, news groups, and other locations) on the Internet from which they accessed child pornographic images. By bookmarking such locations, these collectors can readily gain access to such sites.

i. Child pornography collectors also tend to collect child erotica because it is more readily available, partially satisfies their sexual fantasies, and is often intermixed with child pornography on the Internet.

**TOOLS OF THE INTERNET**

13. Based upon my knowledge, training and experience in child exploitation and child pornography investigations and the experience and training of other law enforcement officers with whom I have had discussions, I know that the development of computers has also revolutionized the way in which child pornography collectors interact with, and sexually exploit, children. Computers serve four basic functions in connection with child pornography: production, communication, distribution, and storage. More specifically, the development of computers has changed the methods used by child pornography collectors in these ways:

a. Producers of child pornography can now produce both still and moving images directly from a common video or digital camera. The camera is attached, using a device such as a cable, or digital images are often uploaded from the camera's memory card, directly to the computer. Images can then be stored, manipulated, transferred, or printed directly from the computer. Images can be edited in ways similar to how a photograph may be altered. Images can be lightened, darkened, cropped, or otherwise

manipulated. The producers of child pornography can also use a device known as a scanner to transfer photographs into a computer readable format. As a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute child pornography. In addition, there is an added benefit to the pornographer in that this method of production does not leave as large a trail for law enforcement to follow.

b. The Internet allows any computer to connect to another computer. By connecting to a host computer, electronic contact can be made to literally millions of computers around the world. A host computer is one that is attached to a network and serves many users. Host computers are sometimes operated by commercial ISPs, such as America Online, Inc., AT&T, and Comcast, to name a few, that allow subscribers to dial a local number and connect to a network that is, in turn, connected to the host systems. Host computers, including ISPs, allow e-mail service between subscribers and sometimes between their own subscribers and sometimes between their own subscribers and those of other networks. In addition, these service providers act as a gateway for their subscribers to the Internet. Individuals who use the Internet can communicate electronically by using e-mail. E-mail messages can contain text, data, or graphic images. This type of communication is private in that it is directed from one Internet user to another. Internet users can also communicate and trade images of child pornography using Instant Messaging. Instant Messaging is "real time" communication in that the persons communicating are engaging in online dialog. This means of communication, like e-mail, is private in that it is one Internet user communicating specifically, and exclusively, with another.

c. The Internet allows users, while still maintaining perceived anonymity, to easily locate (i) other individuals with similar interests in child pornography; and (ii) web sites and social networking sites that offer images of child pornography. Child pornography collectors can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other and to distribute child pornography. These communication links allow contacts around the world to be made as easily as calling next door. Additionally, these communications can be quick and relatively secure. The ease of trading and downloading child pornography via the Internet allows such collectors to increase the number of images in their collections quite rapidly. All of these advantages, which promote anonymity for both the distributor and recipient, are well known and are the foundation of transactions between child pornography collectors over the Internet. Sometimes the only way to identify both parties and verify the transportation of child pornography over the Internet is to examine the recipient's computer, including the Internet history and cache to look for "footprints" of the web sites and images accessed by the recipient.

d. A computer's capability to store images in digital form makes it an ideal repository for child pornography. A single USB flash drive can store thousands of images and millions of pages of text. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Hard drives with the capacity of 500 gigabytes are not uncommon. These drives can store hundreds of thousands of images at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a

computer with a video capture board, and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime". Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail. Digital evidence of the results of web browsing can often be found on the hard drive of a computer during a forensic examination. In addition, the dialog and image downloads created when corresponding via e-mail and instant message are generally stored in the hard drive of a computer until overwritten by other correspondence, and are usually retrievable during a forensic examination of the computer.

**OVERVIEW OF PEER TO PEER FILE SHARING**

14. The present investigation was initiated as a result of the law enforcement community's ongoing concern related to the escalating prevalence of the distribution of child pornography via Peer to Peer (P2P) file sharing software. Based upon my training and experience and the training and experience of other agents with whom I work and with whom I have spoken, I know that, presently, millions of people throughout the world use P2P file sharing networks to share many types of files with others. P2P application software allows network computer users, connected to the Internet, to share many types of files; these files typically include music, graphics, images, movies, and text. In this way, users are able to collect large numbers of files, including child pornography.

15. Based upon my training and experience and the training and experience of other agents with whom I work and with whom I have spoken, I know that the most prevalent P2P file sharing network presently in use today is known as the "Gnutella" network.

Gnutella is a system that allows individuals to use their computers to exchange files directly over the Internet without having to go through or access a specific web site in an arrangement that can best be described as computer to computer (or person to person, hence the name "Peer to Peer"). Unlike a web site, Gnutella enables persons to obtain files directly from one another as long as they are connected to the Internet. Furthermore, Gnutella enables an individual to view the files of other Gnutella users made available to share. Upon installation and enabling of Gnutella on one's computer, that computer then becomes both a client and a server in the network and is able to share desired files, which have been placed in what is referred to as a "share folder" on a user's hard drive, with other Gnutella users. The Gnutella network is presently utilized by numerous P2P file sharing programs, including, but not limited to "eMule" and "Limewire". These aforementioned programs connected to the Gnutella network have software that, if installed on a computer, facilitates the trading of images and other files.

16. Based upon my training and experience and the training and experience of other agents with whom I work and with whom I have spoken, I know that because of its relative ease of use and perceived anonymity, P2P networks provide readily available access to child pornography. As a result, law enforcement officers/agents have initiated undercover investigations via the Internet to identify persons using P2P software to traffic in child pornography.. Law enforcement officers/agents assigned to these types of investigations know, from their experience using P2P software, that users can find images and movies of child pornography by using search terms or browsing another user's shared folders.

17. Based upon my training and experience and the training and experience of other agents with whom I work and with whom I have spoken, I know that one new type of P2P software allows users to set up their own private P2P network of contacts. File sharing through this software is limited only to other users who have been added to a particular user's private list of "friends". A new user is added to a user's list of friends through a "friend request" or "invite". Once accepted as a "friend" the new friends "screen" or "user name" is added to the list of other such friends of the computer user. Acceptance of a friend request will allow that new user to download file(s) from the user who sent the friend request. The new user can then browse the list of files the other user has made available to share/download, select the file(s) from this list, and download the selected file(s). The download of a file is achieved through a direct connection between the computer requesting the file and the computer containing the file. The software allows users to browse a friend's files, by navigating a file structure similar to that of a desktop computer. Additionally, thumbnails of images can be viewed by a user prior to actually downloading the file. This allows a user to browse images and select those that s/he wants to download. The software also contains a "Transfers" screen that provides information on all files being uploaded or downloaded. This not only allows a user to see the files s/he is downloading from other users, but also who is uploading files from him/her.

18. Based upon my training and experience and the training and experience of other agents with whom I work and with whom I have spoken, I know that once a person becomes a "friend" of the user of the target computer, and acquires access to that target

computer's shared folders, that friend's user or screen name is contained, usually in a "friends" listing, on the target computer.

19. Based upon my training and experience and the training and experience of other agents with whom I work and with whom I have spoken, I know that Internet computers identify each other by an Internet Protocol or IP address. I know that these IP addresses can assist law enforcement in finding a particular computer on the Internet. These IP addresses can lead the law enforcement officer to a particular ISP, and that company can identify the account that used the IP address to access the Internet.

20. Based upon my training and experience and the training and experience of other agents with whom I work and with whom I have spoken, I know that third party software is available to identify the IP address of the P2P computer sending the file. Such software monitors and logs Internet and local network traffic.

**SEARCH AND SEIZURE OF COMPUTERS AND RELATED STORAGE MATERIALS IN GENERAL**

21. Based upon my training and experience and the training and experience of other agents with whom I work and with whom I have spoken, I know that information stored in an electronic format may be found not only on the hard disk drive of a computer, but also on other computer hardware, peripherals, and storage media. In addition, to conduct a thorough search of computers, agents are often required to seize most or all of the computer hardware, peripherals, and other storage media, to be searched later by a qualified expert in a laboratory or other controlled environment. This is true for the following reasons:

a. Nature of the Evidence: As described, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a

computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.

b. Volume of Evidence: Computers and storage devices (like hard disks, diskettes, tapes, CD ROMs, DVDs, and zip drives) can store the equivalent of thousands of pages of information. Also when the user wants to conceal criminal evidence, he or she may store it in many places, in random order, and with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take several weeks to conduct, and it would be impractical to attempt this kind of data search on site.

c. Technical Requirements: Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment needed to conduct a thorough search. In addition, it may be necessary to consult with personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

d. Retrieval of Electronically Stored Data: In order to retrieve electronically stored evidence from a computer, agents may be required to seize most or all of a computer system's equipment, including hardware, peripherals, software, documentation, security devices, and passwords. This is true because of the following:

1) Certain operating systems and hardware can be configured to operate only with a precise set of hardware, software, and peripherals.

2) Peripheral devices that allow users to enter or retrieve data from the storage devices may vary in their compatibility with other hardware and software.

3) The searching authorities may have to install software used by the suspect on a government computer in order to retrieve the information the suspect may have stored using that software. The searching authorities may also need to refer to hardware and software documentation maintained by the suspect to complete an analysis in a timely manner. The suspect's computer documentation may also contain hand written notes specific to the seized computer system.

e. The Nature of Data Storage: Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensics tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache". The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently

viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. The search for these files and file fragments can take considerable time, depending on the computer user's practices. It often takes weeks or months to complete such a search, particularly if many hard drives and other storage media are seized from the location to be searched. A thorough search for such relevant evidence would be impractical during an on site preview.

22. As further described in Attachment B, this warrant seeks permission to locate in the SUBJECT PREMISES not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, and who used them.

23. Further, as described above and in Attachment B, this application seeks permission to search and seize records that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is electronic, in that they are stored on a computer's hard drive, or other electronic media. Some of these electronic records might take the form of files, documents, and other data that is user generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis of the computer(s) or other electronic storage media seized.

24. Although some of the records called for by this warrant might be found in the form of user generated documents (such as word processor, picture, and movie files), computer hard drives can contain other forms of electronic evidence as well. In

particular, records of how a computer has been used, the purposes for which it was used, and who has used it are called for by this warrant. As described above, data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e mail programs, and chat programs store configuration information on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals (e.g., cameras and printers for creating or reproducing images), the attachment of USB flash storage devices, and the times and dates the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created. This information can sometimes be evidence of a crime, or can point toward the existence of evidence in other locations. Evidence of this type often is not simply "data" that can be merely reviewed by a review team and passed along to investigators; rather, evidence of this type is a conclusion, based on a review of all available facts and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand the evidence described in Attachment B is included within the scope of the warrant.

25. In finding evidence of how a computer has been used, the purposes for which it was used, and who has used it, sometimes it is necessary to establish that a particular thing is not present on a drive. For example, I know from training and experience that it

is possible that malicious software can be installed on a computer, often without the computer user's knowledge. This software can allow a computer to be used by others. To investigate the crimes described in this warrant, it might be necessary to investigate whether any such malicious software is present on the computer, and, if so, whether the presence of that malicious software might explain the presence of other things found on the computer's hard drive.

26. Law enforcement personnel trained in searching and seizing computer data will seize the computers, computer hardware, storage media, associated system peripherals, and digital devices that are believed to contain or constitute fruits, evidence and instrumentalities as described in Attachment B to the warrant, and transport the same to an appropriate law enforcement laboratory for off site review, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search these items on site for the evidence, fruits and instrumentalities. The computer equipment and storage devices will be reviewed by a review team in accordance with and as defined by the review protocols described below in order to extract and seize any data that falls within the list of items to be seized as set forth in Attachment B.

27. In order to fully retrieve data from a computer system, the analyst needs all electronic storage devices as well as the computer's central processing unit (CPU). The analyst may also need the computer's storage devices, the monitor, keyboard, modem, and other related hardware. As in this case where the evidence consists partly of graphic files, the monitor and printer are essential to show the nature and quality of the graphic images that the system could produce. In addition, the analyst needs all the system software (operating systems or interfaces and hard drive drivers) and any application

software that may have been used to create the data (whether stored on hard drives or on external media).

**SPECIFIC METHODS FOR SEARCH OF DIGITAL EVIDENCE**

28. I am seeking authority to search for, among other things, items containing digital data, more particularly described in Attachment B. As many devices commonly found in a residence may contain digital data, I will make every reasonable effort to minimize seizures to only those devices for which there is reason to believe might be found: 1) evidence or fruits of the aforementioned crimes; 2) contraband implicated by this affidavit; and 3) property/instrumentalities designed for use, intended for use, or used in the commission of the aforementioned crimes. If personnel trained in the forensic preview of digital evidence are available, and if doing so will not extend the duration of the search to an unreasonable time and is consistent with the review protocol detailed below, I intend for there to be an on scene preview of the digital evidence in order to minimize the amount of material that needs to be removed from the premises. I know that certain tools are available to trained personnel that make such previews possible under certain circumstances. Such a preview generally consists of reviewing images and videos contained on digital media, and searching for filenames that appear to contain references to child pornography. These previews are done in a manner that preserves the integrity of the data on the device. A forensic preview is not a substitute for a forensic examination, but in certain instances (such as when it is possible through interviews to determine which items belong to uninvolved third parties), an on site forensic preview can be a useful tool in minimizing the number of digital devices that need to be removed from the premises for a full forensic examination. If an item that may reasonably contain

evidence of child pornography cannot be eliminated from suspicion, I intend to remove it to a laboratory setting for a more detailed forensic examination, in accordance with the parameters described below.

29. As previously mentioned, the search of a computer hard drive or other computer storage medium is a time consuming manual process often requiring months of work. I know that the seizure of a computer hard drive, by necessity, provides the seizing agency with potential access to data outside the scope of this warrant. A search protocol will be used to uncover solely evidence, instrumentalities and contraband set forth in Attachment B for which there is probable cause. As part of the search protocol, I intend to direct the review team to search any computer and computer storage medium only for those items contained in Attachment B. As it concerns this particular case, I intend to direct the review team to search digital media with some or all of the following methods, not listed in any particular order; however, the listing of these methods is not a representation that these specific techniques will be employed in this case:

a. Keyword Searches: I know that computer forensic utilities provide the capability for a user to search for specific key words that may exist on a piece of digital media. I intend to use specific keywords known to be related to either the subject's illicit internet activities or child pornography. As it concerns child pornography, examples of such keywords include, but are not limited to, "preteen", "hussyfan", and "r@ygold". Those keyword searches will indicate files and other areas of the hard drive that need to be further reviewed to determine if those areas contain relevant data. A list of keywords utilized will be maintained with the records of the forensic examination.

b. Data Carving: I know that, as previously mentioned, data residue may be left in the "free", "unallocated", or "slack" space of a computer hard drive, that is, the space not currently used by active files. I further know that, as previously mentioned, many operating systems utilize temporary storage often referred to as "swap space" on the hard drive to store contents from main system memory. Such unallocated and swap space may contain the residue of files that can be carved out, often in an automated or semi automated fashion. I intend to use forensic tools to carve out files, in particular, image files such as JPEG and GIF files. The mere act of carving out such files does not expose me to the contents of such recovered files, but makes those files available for further relevancy checks, such as keyword searches (explained above) and hash value comparisons (explained below).

c. Hash Value Comparisons: I know that computer forensic utilities provide the capability to utilize a function known as a hash algorithm. A hash algorithm uses a mathematical formula to analyze the data composing a file, and to generate a unique "fingerprint" for that file. The act of hashing a piece of data does not reveal to an investigator any information about the contents of that data. However, I know that computer forensic applications often contain databases of known hash values for files. Some of those files are "ignorable", which enables other forensic processes to ignore files (such as the Windows operating system) that are not evidentiary in nature. Some of the files are "alert" files, such as the Child Victim Identification Program (CVIP) hash set that contains hash values for a small subset of the identified picture and video files for known victims of child pornography. CVIP alert files notify an examiner that a file appears to contain known depictions of child pornography. I seek permission to utilize

automated hash value comparisons to both exclude irrelevant files, and to locate known child pornography files. Hash value comparisons are useful, but not definitive, as even a single bit change to a file will alter the hash value for the file. The forensic review team does not intend to rely solely on hash value comparisons, but intends to utilize them in order to assist with identifying relevant evidence. The use of this search method is intended to narrow the search. A search of known hash values, however, will not be used exclusively, because I know that when previously identified images of child pornography are found on a target's computer, typically there are many more images of child pornography depicting unknown child victims. Using a hash value search method exclusively would not uncover these images of unknown child victims as well as other evidence authorized by this warrant and described in Attachment B.

d. Opening Container Files, Encrypted Volumes, Embedded Files: I know that relevant data may be compressed, encrypted, or otherwise embedded in other files or volumes. It is often not possible through any automated process to examine the contents of such containers without opening them, just as it is not possible to examine the contents of a locked safe without first opening the safe. In the event that compressed, encrypted, or otherwise embedded files or volumes may exist on the seized items, I intend to use sophisticated forensic tools to attempt to open any such container files that may reasonably contain evidence of child pornography.

e. File Header / Extension Checks: I know that individuals involved in illegal activities on a computer often change the extension of a file (such as .jpg) to some other incompatible extension (such as .txt) in order to disguise files from casual observers. The extension of a file, however, is not necessarily linked to the "header" of a

file, which is a unique marking imbedded automatically in many types of files. By comparing the extension of a file with the "header information" of a file, it is possible to detect attempts to disguise evidence of illegal activities. Such a comparison can be made in an automated process by computer forensic tools. I intend to run an automated header comparison to detect such efforts, and intend to review any such files that reasonably may contain evidence of child pornography.

f. Thumbnail / Image Views: Although hash value comparisons can positively identify known child pornography depictions, a negative hash value comparison does not exclude an image from suspicion. There is no known alternative for visually inspecting each image file. I therefore intend to examine at least a thumbnail image of each image file on the digital media whether "live", "data carved", or identified by header.

g. Registry / Log File Checks: I know that it is necessary in any criminal case to establish not only that a crime has occurred, but also to establish what person committed that crime. Operating systems and computer programs often maintain various administrative files such as logs that contain information about user activities at certain times. In the Windows operating system, for example, some of these files are collectively referred to as "the registry". Such files contain specific information about users, often including e-mail addresses used, passwords stored, and programs executed by a particular user. These files may also contain evidence regarding storage devices that have been connected to a computer at some time. Multiple backup copies of such files may exist on a single computer. I intend to examine these files to attempt to establish the identity of any user involved in the receipt, possession, distribution, and transportation of

child pornography, and to establish methods (such as software used) and dates of this activity.

h. Metadata / Alternative Data Streams: I know that many file types, operating systems, and file systems have mechanisms for storing information that is not immediately visible to the end user without some effort. Metadata, for example, is data contained in a file that is not usually associated with the content of a file, but is often associated with the properties of the application or device that created that file. For example, a digital camera photograph often has hidden data that contains information identifying the camera that manufactured it, and the date the image was taken. Some file systems for computers also permit the storage of alternate data streams, whereby a file such as a text file may hide an image file that would not be immediately visible to an end user without some action taken. I know that both metadata and alternative data streams may contain information that may be relevant to child pornography offenses. Metadata and alternative data streams are often identified and processed automatically by computer forensic utilities. I intend to review any such data that is flagged by any process above as being relevant to the receipt, possession, distribution, and transportation of child pornography.

30. With rare exception, the above listed search techniques will not be performed on original digital evidence. Instead, I know that the first priority of a digital evidence forensic examination is the preservation of all data seized. As such, original digital media will be, wherever possible, copied, or "imaged", prior to the start of any search for evidence. The copy will be authenticated digitally as described in the paragraph below.

31. I know that a digital forensic image is the best possible copy that can be obtained for a piece of digital media. Forensic imaging tools make an exact copy of every accessible piece of data on the original digital media. In general, the data contained on the original media is run through a hashing algorithm as described above, and a hash value for the entire device is generated. Upon completion of the imaging process, the same hash algorithm is run on the imaged copy to insure the copy is an exact duplicate of the original. Upon the completion of the search processes described above, which are performed on the image of the hard drive, the hash algorithm is again run on the image copy to insure no alterations of the data occurred during the examination process.

32. In the event that a piece of original digital media is found not to be (a) an instrumentality of the offense, (b) a fruit of the criminal activity, (c) contraband, or (d) evidence of the offenses specified herein, it will be returned as quickly as possible, not to exceed 120 days.

33. A 120-day review window is requested due to the delay that may be caused by the review protocols explained below.

34. I also hereby request judicial authorization to retain copies of all seized storage media after the review is complete. That judicial authorization is justified in this case in part because:

a. Should the execution of the warrant uncover data that may later need to be introduced into evidence during a trial or other proceeding, the authenticity and the integrity of the evidence and the government's forensic methodology may be contested issues. Retaining copies of seized storage media can be required to prove these facts and

the investigator may retain a copy of seized or electronically stored information pursuant to Fed. R. Crim. P. 41(f)(1)(B):

b. Returning the original storage medium to its owner will not allow for the preservation of that evidence. Even routine use may forever change the data it contains, alter system access times, or eliminate data stored on it.

c. Because the investigation is not yet complete, it is not possible to predict all possible defendants against whom evidence found on the storage medium might be used. That evidence might be used against persons who have no possessory interest in the storage media, or against persons yet unknown. Those defendants might be entitled to a copy of the complete storage media in discovery. Retention of a complete image assures that it will be available to all parties, including those known now and those later identified. Specifically in this case, based on the nature of P2P file sharing, forensic analysis may identify the user names and screen names of those distributing child pornography to the user of the target computer(s).

d. The act of destroying or returning a storage medium could create an opportunity for a defendant to claim, falsely, that the destroyed or returned storage medium contained evidence favorable to him. Maintaining a copy of the storage medium would permit the government, through an additional warrant if necessary, to investigate such a claim.

e. Similarly, should a defendant suggest an explanation for the presence of evidence on a storage medium or some defense, it may be necessary to investigate such an explanation or defense by, among other things, re-examining the storage medium with that explanation/defense in mind. This may require an additional examination of the

storage medium for evidence that is described in Attachment B but was not properly identified and segregated previously.

f. I have not attempted to acquire the sought after material through any other investigative or judicial process.

**REVIEW PROTOCOL**

Government personnel will utilize the following computer review protocol:

A. Contextual evidence that establishes how computers were used, the purpose of their use, and who used them is a conclusion, based on a review of all available facts and the application of knowledge about how a computer behaves. Therefore, such evidence necessary to understand the evidence described in Attachment B is included within the scope of this warrant and will be seized.

B. Although it is not possible to accurately predict the exact composition of the review team, given the very limited computer forensic examination resources available at present, it is possible that the team may include one or more agents, computer specialists, analysts, and/or attorneys including members of the investigative team. The team will not necessarily consist only of persons with those job descriptions, and by referencing those job descriptions, I do not intend to represent anything about the manner in which the team will conduct its review. It is also possible that the review "team" will consist of a single person.

**PROBABLE CAUSE TO SEARCH THE SUBJECT PREMISES**

35. During this investigation, I identified computers and persons located within the Eastern District of California that are distributing images and/or movie files of child

pornography via the Internet through the use of P2P file sharing software. Among them was a computer user with the screen name "boyforboys1".

36. On 12/27/2010, while working in an undercover capacity, I signed on to a P2P file sharing program via an Internet connected computer located at the FBI Sacramento office using an undercover screen name.

37. I observed that the user "boyforboys1" was logged into the network. While recording the session by means of screen capture software, I browsed through the sub-folders of "boyforboys1" and observed numerous files had titles and thumbnails indicative of child pornography (CP). I was able to download approximately 5 image files directly from "boyforboys1"; with at least 3 of the 5 images depicting child pornography. Using the software program CommView, I was able to identify that the files were being downloaded from "boyforboys1" at the Internet Protocol (IP) address 67.172.180.130, registered to Comcast Communications.

38. Additionally, on 1/3/2011, while working in an undercover capacity, I signed on to the same P2P file sharing program via an Internet connected computer located at the FBI Sacramento office using an undercover screen name.

39. I observed that the user "boyforboys1" was again logged into the network. While recording the session by means of screen capture software, I browsed through the sub-folders of "boyforboys1" and observed numerous files had titles and thumbnails indicative of child pornography (CP). I was able to download approximately 8 image files and 6 videos directly from "boyforboys1"; with at least 5 of the images and 2 of the videos depicting child pornography. Using the software program CommView, I was able

to identify that the files were being downloaded from "boyforboys1" at the Internet Protocol (IP) address 67.172.180.130, registered to Comcast Communications.

40. Two administrative subpoenas were served on Comcast Communications for the IP addresses and times listed above. Comcast Communications responded to both administrative subpoenas with negative results, stating that they were unable to find information relating to the subpoenas and that their logs were either incomplete or contained errors. I spoke with a Comcast technical representative regarding the negative results, who advised that negative results typically indicate an individual is using an unauthorized and/or unregistered cable modem.

41. The following are a sample of the filenames and descriptions of the files depicting child pornography that I downloaded from "boyforboys1" on December 27, 2010 and January 3, 2011:

**"aaaa boylove gay pedo preteen boy sex child porn 045.jpg"**

This image file depicts a nude prepubescent male minor orally copulating another nude prepubescent male minor's penis. In the lower left hand corner of the image there is another picture of a prepubescent male's penis, and the words "ALL-MALE CHILD PORN- KIDSEX ROCKS!".

**"1 Noah asleep sucked by dad.wmv"**

This video file is approximately 2 minutes and 1 second in duration and depicts an adult male orally copulating a prepubescent male minor's penis, and then stroking the boy's penis while the boy appears to be sleeping.

**"__hr_cab3.jpg"**

This image file depicts a nude prepubescent male minor holding his hands at the base of his erect penis.

42. The user "boyforboys1" was also observed logging into the same P2P file sharing network using the IP address 64.160.118.55 on several different dates including 3/13/2011 and 3/28/2011.

43. On 3/28/2011, while working in an undercover capacity, I signed on to the same P2P file sharing program via an Internet connected computer located at the FBI Sacramento office using an undercover screen name.

44. I observed that the user "boyforboys1" was logged into the network. While recording the session by means of screen capture software, I browsed through the sub-folders of "boyforboys1" and observed numerous files had titles and thumbnails indicative of child pornography (CP). I was able to download approximately 64 image files and 5 videos directly from "boyforboys1"; with at least 36 of the images and 4 of the videos depicting child pornography. Using the software program CommView, I was able to identify that the files were being downloaded from "boyforboys1" at the Internet Protocol (IP) address 64.160.118.55, registered to AT&T Internet Services.

45. The following are a sample of the filenames and descriptions of the files depicting child pornography I downloaded from "boyforboys1" on March 28, 2011 from IP address 64.160.118.55:

**"boys with boners.avi"**

This video file is approximately 3 minutes and 41 seconds in duration and depicts two prepubescent male minors masturbating and playing with their erect penises.

**"cp_220.bmp"**

This image file depicts a nude prepubescent male minor orally copulating another male minor.

**"PIC_0016.JPG"**

This image file depicts two nude prepubescent male minors in a shower while one boy is bending over and holding the other boy's erect penis.

46. An administrative subpoena was served on AT&T Internet Services for the IP address 64.160.118.55 for 3/13/2011. The AT&T Internet Services response indicated the subscriber associated with IP address 64.160.118.55 resides at 2505 5th Street, Apartment 242, Davis, California, 95616. The subpoena results listed the subscriber account as currently active (as of 3/29/11) and further stated that the IP address 64.160.118.55 was first issued to that subscriber on 02/08/2011.

47. On 3/29/2011, I spoke with the apartment manager of Greystone Apartments, 2505 5th Street, Davis, California, 95616 regarding this investigation. The manager confirmed that the subscriber named by AT&T resides in Apartment 242 along with two other people.

48. A public records database check identified the AT&T subscriber's name as being associated with 2505 5th Street, Apartment 242, Davis, California, 95616.

49. On 4/1/11, a federal search warrant signed by Magistrate Judge Gregory Hollows was executed at 2505 5th Street, Apartment 242, Davis, California, 95616.

50. Two people, (Cooperating Witness #1, "CW1", and Cooperating Witness #2, "CW2"), were at home at the time the warrant was executed. I interviewed CW#1 who advised that she lived at 2505 5th Street, Apartment 242, Davis, California, 95616, with two other roommates, including CW2. CW1 stated that her she is the subscriber named

by AT&T, and that her home wireless network was named "2WIRE703" which was confirmed by agents on-scene. Additionally, the wireless network was password protected using a 10-digit numeric password using the Wired Equivalent Privacy (WEP) protocol.

51. Special Agent Michael Cahoon, who was present during the execution of the search warrant, was able to analyze the AT&T internet wireless router which provided wireless internet to the residents of Apartment 242. Agent Cahoon was able to identify all internet devices that had recently connected to the internet connection in Apartment 242 via internal IP addresses and Media Access Control (MAC) addresses. Agent Cahoon also determined that the external IP address currently assigned to Apartment 242 by AT&T was 69.105.80.128.

52. All of the devices belonging to the residents of Apartment 242 and their friends were accounted for in the router log and forensically reviewed on-scene, none of which possessed any evidence of child pornography, nor any evidence of the P2P file sharing program used by "boyforboys1".

53. It was determined that there was still one more device that had recently accessed the password-protected wireless network in Apartment 242 that was not located during the search. The device was listed in the router as "CK" with a MAC address of: 00:25:d3:d4:c4:73. "CK" was not connected to the wireless internet belonging to Apartment 242 at the exact time of the search, however it was listed as a device that had recently been connected. None of the residents in Apartment 242 recognized the device name "CK".

54. Additionally, in another area of the AT&T wireless router logs, another device named "bootycop" had recently accessed the wireless Internet connection in Apartment 242, but was unaccounted for and not known by any of the residents.

55. During the execution of the search warrant, Special Agent Derren Holtz and Special Agent Laura Giouzelis used an open-source wireless tracking utility to determine if the Internet device "CK" was in the vicinity of Apartment 242. The tool was a wireless antenna in a passive mode which allows it to detect if a specific MAC address is currently within range by filtering out all other MAC address information Using signal strength readings from inside Apartment 242, from Apartment 240 (a vacant apartment which the apartment manager allowed us to access), and the outdoor common areas of the apartment complex, Agents Holtz and Giouzelis concluded that the device "CK" with MAC address 00:25:d3:d4:c4:73 was most likely located in the second floor of **2505 5th Street, Apartment 243, Davis, California, 95616.** The residence **2505 5th Street, Apartment 243, Davis, California, 95616,** is a corner apartment situated between Apartments 242 and 240.

56. On 4/8/11, while working in an undercover capacity, I signed onto the same P2P file sharing program via an Internet-connected computer located at the FBI Sacramento office using an undercover screen name. I observed that user "boyforboys1" was logged into the network. While recording the session by means of screen capture software, I browsed the subfolders of "boyforboys1" and observed that the user was sharing two videos depicting child pornography. Using the software program CommView, I was able to identify that the files were being downloaded from "boyforboys1" at the Internet Protocol (IP) address 69.105.80.128, registered to AT&T Internet Services. This is the

same IP address observed a week prior at Apartment 242. The following are the two videos of suspected child pornography downloaded:

**"!!!!kids piss play.flv"**

This video is approximately 17 seconds in duration and depicts two nude prepubescent male minors urinating on each other.

**"_Nick_gets_sucked_by_yng_boy"**

This video is approximately 18 seconds in duration and depicts a nude prepubescent male minor orally copulating a nude male minor.

57. On 4/8/2011, a few hours after my undercover session, I spoke with CW1 and she consented to allowing me and my colleagues to return to her residence.

58. We returned to Apartment 242 at approximately 12:30pm on 4/8/2011 and, with the consent of CW1, re-examined the AT&T wireless router. There were two wireless devices currently active and logged into the AT&T wireless router: "CK" with MAC address 00:25:d3:d4:c4:73 and "bootycop" with MAC address 00:1f:1f:49:d3:11. No other devices, other than the FBI computer used to log into the router, were currently accessing the wireless router and using the Internet.

59. I determined there were only two computers accessing the network, and none of those computers were physically located in Apartment 242. Using an undercover laptop with separate internet access, I verified that "boyforboys1" was still logged into the P2P file sharing program, which it was. I also re-verified that the IP address 69.105.80.128 being used by "boyforboys1" was still the IP address assigned to Apartment 242, which it was. After some time in the residence, the device named "CK" disconnected from the

network, leaving the only connected computer as "bootycop" while "boyforboys1" was still logged into the P2P file sharing program.

60. Using the same open source wireless networking tool and passive mode directional antenna used on 4/1/2011 during the execution of the search warrant, I was able to determine that the internet device named "bootycop" with MAC address 00:1f:1f:49:d3:11 was most likely located in the second floor of **2505 5th Street, Apartment 243, Davis, California, 95616.** I determined this to be the case by taking numerous signal strength readings at various locations within Apartment 242 and Apartment 240 (a vacant apartment which we entered with the consent of the apartment manager), with **2505 5th Street, Apartment 243, Davis, California, 95616** being the only apartment between the two other apartments. The signal strengths were similar to the readings of internet device "CK" taken on 4/1/2011, and I believe that "CK" and "bootycop" are associated with each other and located in the same apartment, inasmuch as they both were able to connect to a password-protected wireless router in an unauthorized manner.

61. Based upon my training and experience and the training and experience of other agents with whom I work and with whom I have spoken, I know that it is possible to gain unauthorized access to a password protected wireless network using the WEP protocol, however it requires advanced computer knowledge and tools. An individual with the knowledge necessary to crack a password-protected network would likely also have a strong understanding of IP addresses and how law enforcement might use them to identify a subject. It is reasonable to suspect that an individual in the SUBJECT

PREMISES may have intentionally stolen internet access from Apartment 242 in an effort to conceal his/her identity while distributing child pornography online.

## CONCLUSION

62. Based on the aforementioned factual information, I respectfully submit that probable cause exists to believe that an individual who resides at the SUBJECT PREMISES, described in Attachment A, is involved in child pornography offenses. I respectfully submit that probable cause exists to believe that an individual residing in the SUBJECT PREMISES violated 18 U.S.C. §§ 2252 and 2252A and that evidence, fruits, and instrumentalities of those, as more particularly described in Attachment B, will be found at the SUBJECT PREMISES.

I swear, under penalty of perjury, that the foregoing Information is true and correct, to the best of my knowledge, information and belief.

NICHOLAS G. PHIRIPPIDIS
Special Agent
Federal Bureau of Investigation

Read and approved as to form.

MATTHEW MORRIS
Assistant United States Attorney

Subscribed and sworn to before me
this 11th day of April, 2011

GREGORY G. HOLLOWS

Gregory G. Hollows
United States Magistrate Judge
Eastern District of California
Sacramento, California

**ATTACHMENT A**
**LOCATION TO BE SEARCHED**

A 3 bedroom, 2 story apartment located at **2505 5th Street, Apartment 243, Davis, California, 95616.** The subject residence is located within the Greystone Apartment Complex on the second floor. The front door is beige in color with dark orange trim. The numbers "243" are located to the left side of the front door. This address is located in Yolo County in the State and Eastern District of California. Besides the residence, the property to be searched will include any garages, outbuildings, and vehicles that fall under the domain and control of the person(s) associated with said residence.

Moreover, the property to search includes any computer, computer system and related peripherals, digital device, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, digital cameras, scanners, computer photographs, graphic interchange formats and/or photographs, undeveloped photographic film, slides, cellular telephones/hybrids, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI, and MPEG), and any electronic data storage devices including, but not limited to, hardware, software, diskettes, CD ROMs, DVDs, DVRs, flash memory devices, and other storage mediums, any input/output peripheral devices, including but not limited to passwords, data security devices and related documentation, and any hardware/software manuals related thereto found within the location to be searched. **END OF ATTACHMENT A**

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

The following items, images, documents, communications, records, materials, and information are to be seized wherever they may be stored or found on location to be searched, see Attachment A, and in any form that they may be stored or found:

1. Any child pornography or visual depictions of minors engaged in sexually explicit conduct in any form;

2. Any child erotica;

3. Any information pertaining to any individual's interest in child pornography, visual depictions of minors engaged in sexually explicit conduct, or erotica;

4. Any items, images, documents, communications, records, and information related to the distribution, receipt or possession of child pornography or visual depictions of minors engaged in sexually explicit conduct;

5. Books and magazines containing child pornography or visual depictions of minors engaged in sexually explicit conduct;

6. Originals, copies, and negatives of child pornography or visual depictions of minors engaged in sexually explicit conduct;

7. Motion pictures, films, videos, and other recordings of child pornography or visual depictions of minors engaged in sexually explicit conduct;

8. All screen names, user names, and true names of others who may have operated as the source of child pornography or visual depictions of minors engaged in sexually explicit conduct, in any format, downloaded and possessed by the target computer(s).

9. Any items, images, documents, communications, records, and information pertaining to the possession, receipt, transmission, sale, purchase, trade, or distribution of child pornography or visual depictions of minors engaged in sexually explicit conduct that affected or were transmitted or received via computer, some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail, including:

a. envelopes, letters, and other correspondence including, electronic mail, chat logs, and electronic or other instant messages, establishing possession, access to, affect on, or transmission through interstate or foreign commerce, including by United States mail or via computer, of child pornography or visual depictions of minors engaged in sexually explicit conduct;

b. books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind affecting interstate or foreign commerce or involving the transmission via interstate or foreign commerce, including by U.S. mail or by computer, of any child pornography or visual depiction of minors engaged in sexually explicit conduct;

c. credit card information, including bills and payment information, regarding: Internet service; purchase of computer hardware, software, or storage media; purchase of or payment for memberships to web sites; and possession, receipt, sale, purchase, trade, transportation, or distribution of child pornography or visual depictions of minors engaged in sexually explicit conduct;

d. records evidencing occupancy or ownership of the premises described above, including utility/telephone bills or addressed correspondence; and

e records or other items that indicate ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes.

9. For any computer hard drive, cellular telephone/hybrid, or other electronic media (hereinafter, "COMPUTER") found to contain information otherwise called for by this warrant:

a. evidence of who used, owned, or controlled the COMPUTER at the time the items described in this warrant were created, edited, viewed, or deleted, such as logs, registry entries, saved user names and passwords, documents, and browsing history, to include bookmarked sites;

b. evidence of malicious software ("malware"), which is software designed to infiltrate a computer without the owner's informed consent. The expression is a general term used by computer professionals to mean a variety of forms of hostile, intrusive, or annoying software or program code. The term "computer virus" is sometimes used as a catch all phrase to include all types of malware, including true viruses. Software is considered malware based on the perceived intent of the creator rather than any particular features. Malware includes computer viruses, worms, Trojan horses, most rootkits, spyware, dishonest adware, crimeware and other malicious and unwanted software.

c. evidence of the lack of such malicious software;

d. evidence of the attachment to the COMPUTER of other storage devices, disks, CD ROMS, or similar containers for electronic evidence;

e. evidence of the times the COMPUTER was used;

f. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

g. evidence identifying the location from which images of child pornography were downloaded, including date and time of such downloads;

h. evidence identifying whether image and/or video files containing child pornography were ever viewed, to include date and time of such viewing;

i. evidence identifying whether images and/or videos files were deleted, to include date and time of deletion;

j. evidence relevant to the creation dates of all visual depictions of minors engaged in sexually explicit conduct, to include evidence derived from metadata obtained from child pornographic videos and images;

k. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER; and

l. contextual information necessary to understand the evidence described in this attachment.

**DEFINITIONS**

- Minor - a person under the age of 18 years. 18 U.S.C. § 2256(1)
- Visual Depiction - includes undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format. 18 U.S.C. § 2256(5).

Sexually Explicit Conduct -

(A) Except as provided in subparagraph (B), "sexually explicit conduct" means actual or simulated

(i) sexual intercourse, including genital genital, oral genital, anal genital, or oral anal, whether between persons of the same or opposite sex;

(ii) bestiality;

(iii) masturbation;

(iv) sadistic or masochistic abuse; or

(v) lascivious exhibition of the genitals or pubic area of any person;

(B) For purposes of subsection 8(B) of this section, "sexually explicit conduct" means

(i) graphic sexual intercourse, including genital genital, oral genital, anal genital, or oral anal, whether between persons of the same or opposite sex, or lascivious simulated sexual intercourse where the genitals, breast, or pubic area of any person is exhibited;

(ii) graphic or lascivious simulated;

(I) bestiality;

(II) masturbation; or

(III) sadistic or masochistic abuse; or

(iii) graphic or simulated lascivious exhibition of the genitals or pubic area of any person. 18 U.S.C. § 2256(2).

- Child Erotica - materials or items that are sexually arousing to certain individuals but that are not in and of themselves obscene or do not necessarily depict minors in sexually explicit poses or positions. Such material may include non sexually explicit

photographs (such as minors depicted in undergarments in department store catalogs or advertising circulars), drawings, or sketches, written descriptions/stories, or journals. Child Pornography - means any visual depiction, including any photograph, film, video, picture, or computer or computer generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where

(A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;

(B) such visual depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or

(C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct. 18 U.S.C. § 2256(8).

- The terms "items," "images," "documents," "communications," "records," "materials," and "information" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD ROMs, DVRs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic

notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

- "Digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes, and memory chips; and security devices.

- "Image" or "copy" refers to an accurate reproduction of information contained on an original physical item, independent of the electronic storage device. "Imaging" or "copying" maintains contents, but attributes may change during the reproduction.

**END OF ATTACHMENT B**

**ATTACHMENT C**
**Protocol for Search and Seizure of Computers, Electronic Storage Devices and Any Computer/Electronic Storage Media**
**(Collectively "Computer and Electronic Media")**

1. If agents executing the search warrant conclude that would be impractical to search the computer and electronic media on site for the evidence, contraband, fruits of crime and instrumentalities specified in the warrant, agents will seize the same and conduct an off site search of the same.

2. Any search of computers and electronic media, on site or off, will be performed by a review team which may include agents, computer specialists, analysts, and/or attorneys and personnel presently involved in the investigation or otherwise, or any combination thereof (the "review team"). Original computer and electronic media will be, wherever possible, copied, or imaged, prior to the start of any search for evidence. The review team conducting the search will follow a protocol designed to uncover the information permitted by the terms of the warrant as set forth in attachment B.

3. If the original digital device was seized, law enforcement personnel will perform an initial search of the original digital device within a reasonable amount of time not to exceed 120 days from the date of execution of the warrant. If, after conducting the initial search, law enforcement personnel determine that an original digital device contains any data falling within the list of items to be seized pursuant to this warrant, the government will retain the original digital device to, among other things, litigate the admissibility/authenticity of the seized items at trial, ensure the integrity of the copies, ensure the adequacy of chain of custody, and resolve any issues that potentially might be raised regarding changed conditions of the evidence. If the government needs additional time to determine whether an original digital device contains any data falling within the

list of items to be seized pursuant to this warrant, it may seek an extension of time from the Court within the original 120-day period from the date of execution of the warrant.

4. If an original digital device does not contain any data falling within the list of items to be seized pursuant to this order, the government will return that original device to its owner and seal any image previously made of the device and not review the sealed image absent further authorization from the Court.

5. Notwithstanding the foregoing, if devices are evidence in and of themselves, or are subject to forfeiture as contraband, fruits or instrumentalities of the crimes set forth in the warrant, the government may retain the devices (and any software and data therein) in their original seized condition.

6. In addition, the review team will make one complete copy of all seized computer and electronic media.

**END OF ATTACHMENT C**

AO 93 (Rev. 12/03) Search Warrant

# UNITED STATES DISTRICT COURT

EASTERN District of CALIFORNIA

In the Matter of the Search of

**2505 5th STREET, APARTMENT 243**
**DAVIS, CALIFORNIA 95616**

**SEARCH WARRANT**

Case Number: 2:11-SW-150 GGH

TO: **FEDERAL BUREAU OF INVESTIGATION SPECIAL AGENT NICHOLAS PHIRIPPIDIS** and any Authorized Officer of the United States.

Affidavit(s) having been made before me by **NICHOLAS PHIRIPPIDIS** who has reason to believe that ☐ on the person of, or ☒ on the premises known as (name, description and/or location)

**2505 5TH STREET, DAVIS, CALIFORNIA,** as more particularly described in Attachment A, attached hereto and incorporated by reference.

in the Eastern District of California there is now concealed a certain person or property, namely (describe the person or property)

**SEE ATTACHMENT B, ATTACHED AND INCORPORATED BY REFERENCE.**

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED TO search on or before April 21, 2011 * extend as otherwise ordered
Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search ☒ in the daytime – 6:00 A.M. to 10:00 P.M. ☐ at anytime in the day or night as I find reasonable cause has been established and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken and prepare a written inventory of the person or property seized and promptly return this warrant to **GREGORY G. HOLLOWS** as required by law.
U.S. Magistrate Judge (Rule 41(f)(f4))

**APRIL 11, 2011** @ 2:50 pm at **SACRAMENTO, CALIFORNIA**
Date and Time Issued / City and State

**GREGORY G. HOLLOWS**
**U.S. MAGISTRATE JUDGE**
Name and Title of Judge

GREGORY G. HOLLOWS
Signature of Judge

| RETURN | Case Number: | |
|---|---|---|
| DATE WARRANT RECEIVED | DATE AND TIME WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |
| | | |
| INVENTORY MADE IN THE PRESENCE OF | | |
| INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT | | |

**CERTIFICATION**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

__________________________________

Subscribed, sworn to, and returned before me this date.